This morning will be United States v. Tardon and I'm sure the parties will correct me if I'm pronouncing that incorrectly. Okay, we'll give you time to get settled. Mr. Clue, I believe you and Ms. Wilson are splitting time, is that correct? Yes, your honor. Okay, so you've got seven minutes and whenever you're ready you may begin. Thank you. I'm here with the Tardon Army of First Impression Issues and I'm trying to simplify them and I think some of them can be simplified. The issues cluster into conviction issues, what the statutes, the two main statutes here, 18 U.S.C. 1956 and 1957, say about proceeds that can the subject of those offenses, how those definitions were used in trial, how they were changed after trial to our prejudice, and then further other sufficiency issues relating to the actual proof with regard to various of those elements. Key to that issue is the distinguishing between financial transactions and transportation and the differently defined term monetary transaction. And although the government's brief does not address it, we note in our reply brief that the term monetary transaction is not the only distinction between 1957 and 1956 with regard to for laundering or spending offenses. 1956 also defines the unlawful activity as including, expressly defines it as including international offenses. 1957 does not have that at all. It uses what the Supreme Court said in the small case is generic language about a crime which absent some other statement in the statute is deemed to be domestic crime. So there's two textual statutory factors that show that as to 1957 that it just should not incorporate foreign crimes. So this is on your motion for judgment of acquittal? Yes, it is. Okay, and you don't think that evidence that your client violated foreign drug laws is sufficient? I do not. And the government has made an argument. There's two parts of this. In parts of 1956, it would be sufficient, although the government did not plead it correctly in the indictment, even as to the 1956 count. But the government has made the extraordinary claim in this case that financial transaction should be interpreted to be indistinguishable from the term transportation. And transportation is in a completely different section. It's in 1956A2 as opposed to 1956A1. And the Supreme Court in Regalado Cuellar was very precise in distinguishing what we're saying about transportation doesn't necessarily apply to financial transactions. And this court in all of its decisions and other courts around the country after Regalado Cuellar came out made that distinction. We have to decide whether we're even going to apply Regalado Cuellar to financial transactions because it only addressed this different section of transportation. So I don't understand the government's argument. There's certainly no precedent for it, but they're defined differently. Transaction is specifically defined in the statute. Financial transaction is specifically defined in the statute. Monetary transaction is specifically defined differently in the statute, as are the underlying terms of some unlawful conduct or criminally derived proceeds. That's the issue there. There's a related issue there. The government says that, argues that, well, they didn't have to prove felony underlying proceeds as to 1957. They agree they had to prove it as to 1956. And they agree that nobody testified that any offense in this case, other than presumably the United States offenses that were not proved, were felonies. Doesn't the statute define specified unlawful activity by cross-reference to 1956 C7B as an offense against a foreign nation involving the manufacture, importation, sale, or distribution of a controlled substance as such term is defined under the Controlled Substances Act? The cross-reference is a little narrower than that. What it says is that the same rules that you would apply in determining whether there's a 1956 action that could relate to foreign proceeds apply to 1957. However, applying those rules, it doesn't work for 1957. And again, that's only one part of it. The second part of it is- How, if you apply the same rules, why would it work for one and not the other? The only definition you're applying is that you have to go through the checklist for 1956C, which is the specified C4, rather, or C7. C4 and C7. C7B is what I'm seeing. Right. What that checklist does is it tells you the circumstances in which a financial transaction might apply. And so it limits it. And it limits it even as to financial transactions. So one can't simply say, oh, it's a 1956 case, so foreign transactions apply. Even as to 1956, it doesn't always apply. The transactions, as I understand it, were carried out here, is the argument. And we, of course, take the light. We take the evidence in support of the conviction, since there has been one. But the evidence showed, the government says that the money was derived from the sale of illegal drugs in Spain. But then the transactions occurred in the United States. The laundering occurred in the United States. Do you disagree with that? We disagree as to some of the transactions, whether they really should be as having occurred in the United States. Which ones? The wire transactions from a Spanish bank. But I'm not prepared to argue that today. For our purposes, I'm going to waive that. But we did make an argument that those are not purely in the United States. And again, it does say takes place in the United States. So one certainly can argue that those took place, for the most part, the transaction, the sending of the money, which it's unclear what the jury was convicting on, occurred in Spain. I'm not making that argument. I do want to move to my suppression issues. I just want to make sure I understand your argument. Are you saying that if the illegal drug sales had happened in the United States and everything else was the same, that the conviction would be appropriate? Yes. No, no, I'm not saying that. I'm saying as to apart from the other Picayune arguments we're making about various components of their case on 1957, it would be viable. You still have a multitude of other problems with 1956. But I'm just trying to focus right now on the difference between the statutes and the reasons why one cannot simply transpose the term financial transaction in 1957 into 1957. And also, equally important, the other term in 1957, criminally derived proceeds, which is not defined to include foreign crimes. And again, the government's argument is contradictory. They're saying, which way do you want it? Do you want it to be in 1957 is just like 1956 or do you not? Because if you do want it to be just like 1956, then they have to prove a felony for all of these offenses. And they didn't prove a felony for any of them. And that's very important. They just didn't. The reason why they didn't was because they thought, as we've said, the district court over objections of my co-counsel, that the government had to prove a violation of domestic law, of United States drug laws. And that probably caused the government to think, well, they don't even have to argue it. And they didn't make any argument about it. They simply argued that it certainly violated the United States laws as it did not. So when we made our motion for judgment of acquittal afterwards, again, having preserved the issue instructionally, the district court, the government suddenly realized, oh, we made a big mistake. We instructed the jury that they could find it on domestic drug proceeds, and there are none. And of course, this is the same mistake they had made in the search warrant, in the first indictment, in the second indictment, in the third indictment, even as they switched around. And of course, even in the charging document going back to the jury, sometimes they said four countries, sometimes they said three countries, sometimes they said and, it has to be all of them, and sometimes they said or. So again, it was a mess, but they never proved felony. And they never even tried to allege the things that they would have had to allege, even for the financial transactions. And the argument as to transportation makes no sense at all. It cannot be a transaction. You cannot read Regulata Cuellar and say, oh, well, the Supreme Court wasted three, five pages talking about these distinctions, and there is no distinction. But again- You said you wanted to argue suppression also? Certainly. You have a warrantless search. The case starts exactly, almost exactly 15 years ago with a warrantless seizure of a closed container. The government agreed in the court, in the district court, that it was a closed container. The government agreed that it was Tardone's property exclusively, the defendant's property exclusively, including a diary notebook. The government agreed that- Didn't his then wife have complete access to that property? Not in the legal sense that the case law has used. And this issue comes up more frequently with regard to computers and other types of private documents. But certainly a diary is in that same category. A diary is an item that everybody understands ordinarily one does not look at. And she had never looked at it even though she knew what it existed for five years. She didn't know the contents of it. They didn't know the contents of it. She put his diary in a closed container, as I understand it, put it on the porch. They came there and they picked it up. They picked up a closed container. They then did not get a warrant. They wrote a search warrant affidavit. They didn't tell the magistrate judge- Certainly, the rule isn't that if you put something in a bag, it becomes not consentable for search, right? I mean, you're emphasizing the closed container. If she had left the diary on the porch, would that be a problem? The government cited the case Jarrus. We cited the case Jarrus also. It's a fifth circuit case. I think it's 861 F383 or maybe a second. No, I think it's F3. And it's just two elements to it. It says, does the person give consent and the person have access, as we understand it, the right to access it? And in this case, she did not have the right to access it. Why do we know that? A, the government had already been regulating what she could and could not take of Trudon's property, what she could and could not assert her rights with regard to. But more than that, the divorce, which the government admitted at the hearing that they were well aware of the divorce proceedings, on the very day that this happened, she makes the call to the government after the state divorce court enters an order saying you must reserve his property. You cannot dispose of his property. First of all, you have to give him the right to go to his house tomorrow, July 8th, 2011, and pick up all any items that he says are religious items. Then we will sort out the paperwork at a hearing and you cannot dispose of it. She did not have a right of access. You cannot, I know they want to ignore state law when it comes to forfeiture and all that stuff, but you cannot ignore state law with regard to this property interest. Again, it could be either viewed as a reasonable expectation of privacy from the state divorce court, or it can be viewed as a property interest from the state divorce court. The state divorce court having asserted jurisdiction. Let me ask you a question. Let's assume it was a safe in the house, right? Yes. But she had the passcode to enter into the safe. Are you suggesting that she couldn't access the safe? She couldn't open the safe? Yes. I think she could have opened it, but she couldn't dispose of his property in the safe because of the state court order. She could not. It would be, I mean, it's a contempt of court, and that's the whole point. What if the police come in and say, will you give us access to the safe? And she says, sure. And she opens it for them. Is she not allowed to do that? Then she would have conflicting commands from law enforcement. I suppose you'd have to work that out. But the government tried to keep its hands off of this. They said, no, no, no, we didn't tell her to do this. We came there and there was a closed container of his personal property on a porch. But she had put it in the closed container. Yes, she had because it wasn't hers. And that's the whole point. She also knew that she couldn't dispose of it. That's why she didn't hand it to them. She put his property in a closed container. They knew it was his property. She knew it was his property. She knew she had no right to dispose of it. They knew she had no right to dispose of it. They took the closed container and they didn't tell anybody about it, least of all us at Cass Council, for two years. Least of all the magistrate who issues the search warrant, which again, the government says there is no, we didn't establish false information in the search warrant. The district judge agreed that the search warrant falsely claimed drug crimes that didn't exist, that it falsely authorized the search for drug crimes. There has never been a denial of a Franks hearing, which required at least an over-breadth hearing as well, where you have that type of clear, there was not a shred of evidence of domestic drug trafficking. All right. Thank you. We've let you go substantially over your time. So we'll hear from Ms. Wilson now. Your Honor, if I could just preserve the sentencing issues just briefly so that I can. Why don't you say one thing about them? The 150 year sentence is so horribly disparate because it was never meant to be a guideline range for a country in which has a completely different understanding of drug crimes, Spain. So the Sentencing Commission, its goal since the Sentencing Reform Act of 1984 was to harmonize United States treatment of United States crimes. It was never meant to reach into Spain and persecute somebody for the rest of his life. Right. I think we've got your argument on that. You've preserved it. Thank you. Ms. Wilson, you've got three minutes. Thank you. Good morning, Your Honors. May it please the court, Jenny Wilson, on behalf of the third party petitioners who are challenging the dismissal of their claims for nine wristwatches, two cars and four condominium units. The decision divesting these people of their property must be reversed. This is property that they paid for, that they owned, to which they held legal title and which in some instances was seized from them without even a statutorily required evidentiary hearing. The jury in the forfeiture trade phase of the trial acquitted all of these properties of any involvement in the wrongdoing attributed to criminal defendant Alvaro Tardone. And even though these are substitute assets, that is significant here because the government in both the ancillary proceedings and now on appeal has taken a straw owner theory that is fundamentally at odds with the jury's verdict. I don't want to confuse. I know there was a lot of property and money, but there's evidence in the record. So forgive me if I'm confusing things where, you know, someone says they own the car, but the title is not in their name or there's no title. It's never been registered. You've got property that's supposed to be apartment rentals where no one is renting the property. I mean, the evidence in the record suggests that there was a reason for the straw man argument. So first of all, your honor, the straw man, I'll address the real estate and the cars first. As to the watches, there was no evidentiary hearing at all. And also they concede as to the watches that at least one of the watches, the serial numbers match. So even under this heightened pleading standard that they've asked to impose here for the first time, that's never been understood to be the time and circumstances requirement, even under that theory, there is one watch that they say these invoices and serial numbers match. So I'll deal with the watches in a second, but to address your question, as to the LLCs and the cars, the LLCs, the partnerships had legal title to those LLCs. They paid for them. They had, they were operating dominion and control through a manager. They were rented out. Alvaro Tardone never lived in the apartments. He did not own the apartments. These were completely controlled by the family. And in Florida, the only way that this family could operate these LLCs was through the use of a manager. They owned investment property. His mother owned investment property in Florida, and he was acting as the manager. That does not divest them of legal title. Under state law, which this circuit, even in the cases that the government has cited makes clear, it does apply. Under state law, they had title to this property. They have ownership of this property. And they also have the injury in fact that confers standing, because Artemio, who was a co-owner of the LLCs, a partner member of the LLCs, Alvaro Tardone, the criminal defendant, was not an owner of the LLCs. Artemio was. He paid for the property. He came over here to, you know, visit the property when he would, he would stay in the property. He did business over here related to the properties. It was rented out for a period of time. It was not rented out at some point, because in order for it to be rented, they had to be able to afford the condominium association fees, which was very high, which were very high. And so there was a period of time where it was not rented, but they did earn rental income from those properties. As to the car, the Mercedes McLaren Kite School always had title of that. Kite School was a Spanish car company that was operated by Artemio. It was co-owned by Alvaro, but it was operated by Artemio. Kite School was always on the title to that car, and when it was seized, it was being shipped to Spain. So that's the issue as to the McLaren. The Rolls-Royce is slightly different, but they took that title in 2011. And the government has made a relation back doctrine argument here, but that's again where the jury verdict comes into play, because it wasn't even forfeitable, the Rolls-Royce. So their relation back doctrine argument is a bit of a red herring, because the Rolls-Royce itself was not forfeitable, as the jury verdict found. So in 2011, several years before the forfeiture verdict, there's no relation back issue, precisely because the Rolls-Royce itself wasn't forfeitable. Your baseline argument, I think, is that if the jury finds, as they did here, that certain property was not involved in the money laundering offense charged in count one, then it's not forfeitable under any circumstances. No, that's not my argument. Then tell me what your argument is. My argument is that if it is found not to be traceable, to the offense, and the jury has rejected a straw ownership theory that was presented as the government's basis for arguing that they were directly forfeitable, once you get into substitute asset territory, now people come in who actually have ownership, who have legal title under state law, under Florida law, which United States versus Hassan, one of the cases the government cites, makes very clear that we look to Florida law. What the government is trying to come in and do is replace, if they've taken a footnote in a case, a reference that, oh, if there's a straw owner, then maybe you don't have rights under 853N. They are trying to use that passing reference in the case law, which has always been understood to apply to instances where you have a directly forfeitable property and then a straw owner coming in. And they're trying to use that to say, no, no, this federal common law concept of straw ownership should replace the Florida property law rights. And even under that argument, the petitioners had dominion and control of these properties. They have both. They have legal title, but they also have this more practical dominion and control over it through their operation of the LLCs. And it's important, Your Honor, because we're taking property rights away from third parties through this, who were not involved in the criminal case, who were not involved in the forfeiture proceeding. And the government to come in and say that even though we lost before the jury when we tried to argue that these were Alvaro Tardon's drug proceeds and he was just controlling it as a straw owner, even though the jury rejected that theory, we're now going to come in and in some instances oppose even a hearing, move to dismiss without a hearing as to watches, one of which, when we introduced record evidence showing that these watches were owned by the collection, they've completely shifted. That's my question, though. Given the no verdict from the jury on these items, but you say that's not enough. So what what would be enough if there's a no verdict to have the government be able to have these properties be forfeited? If the third parties didn't own them. I mean, as to the watches, if after a hearing it's established they didn't own them, but the collection owned the watches, that's clear from the record. The collection's name was on all of the invoices. But you think that if you think that you can read into the jury's verdict, jury's no verdict here, I'm just trying to understand argument that you can read into the jury's no verdict here that the jury did not believe that these lawful owners were straw men, then that means that this property was just totally separate. Is that what you're. Right. And that's what the jury found, because that's when you get one step below the government argument. That's where it falls apart. And it starts to become at odds with the jury verdict because their whole theory before the jury was that he was laundering these proceeds through the company. And that's what the idea of a straw owner is. It's we're doing this to cover up some criminality. But if the property itself has been found to be innocent and not traceable to the offense, then you already have the jury finding in place. So they're actually doing what a lot of the cases that they cite say you can't do is you can't come into an 853 hearing and try to relitigate the prior forfeiture. We're not trying to do that. What we're trying to do is say we have ownership of this property under state law. We have control. We have legal title. We have sufficiently alleged. And again, I think we've got your argument. Thank you. Mr. Noll, you've got 15 minutes, but we'll let you go over if need be since we thank you. I'm happy to address the questions as the court has Andrew Noll on behalf of the United States. Over more than a decade, Alvaro Tardone laundered the proceeds of his transnational drug trafficking organization into the Miami area. And he did so through multiple means that we outlined in our brief. This court should affirm his convictions and sentence and also affirm the dismissal of third-party ancillary petitions. Can we start with that actually, since that was where we quit? Why do you disagree with the argument that the jury rejected the straw man theory for these particular assets? So therefore, they have to be clean. So therefore, they're not forfeitable. Because the jury's verdict said nothing about ownership of the property. All the jury decided was whether those specific properties laid out in the special verdict form are ones that in the jury's assessment were involved in the actual offenses for which Tardone was convicted. We then forfeited it as substitute property of Alvaro Tardone. And at that point, now in third-party proceedings, the claimed innocent owners can come in and argue they actually own it. But the jury's verdict said nothing about who owned the property. The third parties, you don't dispute formally own those properties, right? I don't dispute that in some cases, they are on record title, at least as to the cars. I mean, the LLCs had record title. The LLCs had record title of the condominiums. That's not sufficient for purposes of Article 3 standing or statutory standing. And with respect to the cars, although I'm going to put aside Artemio, who the district court dismissed because he's not even on the title to the Mercedes, but with respect to the cars, Tardone's mother and Kite Shoal are on certain of the titles. Now, there is significant evidence in the record to show, and the district court went through this in painstaking detail to say that although the third parties have the burden to come in and substantiate their dominion and control and ownership over these properties, all they pointed to were these kind of records. They think the district court said they presented no witnesses and put forward nine state documents. We put forward over a hundred different exhibits to show that in fact, these entities or these individuals were straw owners or nominees for this property. And I can walk through some of the specifics. I guess my question is more legal. If they were straw owners, then wouldn't that property have been associated with the money laundering? Not necessarily, because I want to separate all of the property Tardone owns in life and the property that the jury specifically found was connected to these assets. The district court entered a monetary judgment for forfeiture of $14 million and some change, and then credited against that the specific property that the jury found traceable to the offense. Because that would leave a delta, the government under the statute is allowed to go out and seek substitute forfeiture of other property Mr. Tardone owns that may be unconnected to the offense. And that is what happened here, and the case law substantiates, there's no barrier for the government to seek property that the jury found not connected to these offenses, but is still Tardone's property, which it can then use as substitute property to satisfy the forfeiture judgment. And so the extent to which this property was or was not connected to the specific 13 enumerated 1957 offenses or the conspiracy doesn't say anything about Tardone's ownership of that property when the government comes in under 853p seeking to forfeit it as substitute property. Your argument is he wasn't trying to launder money through the purchase of these properties, but maybe he just had them for whatever reason, and therefore the government can have them forfeited. Well, to be clear, we don't know what the jury decided. As we point out in our brief, at trial, Mr. Klug, Tardone's counsel, argued because this is the corpus, the ultimate property, the government should be seeking the bank accounts or the money, not the ultimate property. And he argued for that reason, this property isn't forfeitable, even though it might have been kind of at the end of a chain. The jury might have accepted that argument, which we think is legally incorrect, but we just don't know what the jury decided. But at a minimum, it had nothing to do with who owned the property. So we don't know that the jury decided that these were not straw purchasers, right? A hundred percent. That was just not a question the jury was even called upon to decide, and that's the point the district court made. With respect to the, I just want one other point on the ancillary forfeiture proceedings, and then I'll shift gears unless the court has further questions. I would just again go back to the district court's substantial factual findings on this with respect to each of the properties. With respect to the watches, we're actually here on the dismissal of the petitioner's petition because it failed to adequately plead anything specific about their acquisition of the watches, and so I think the evidentiary questions are wholly beside the point. We make some alternative arguments why the record as it existed couldn't even substantiate their claims, but I want to be very clear that all the court has to do here is affirm the dismissal of that petition. With respect to the cars and the condos, you had, as an example, Tardone representing to HOA that he owned the Miramar condos as the owner of the LLC. There were multiple other representations and just the way that he interacted with the LLCs that I think puts beyond dispute any clear error in the district court's findings, and similarly with respect to the cars, Kite Shoal, for example, transferred it back to the United States on letterhead that said it was being transferred for its owner, Alvaro Tardone, who's also the owner of Kite Shoal. So the district court made substantial factual findings that I don't think the petitioners can overcome on clear error review. With respect to the statutory arguments that Mr. Kluge started with, I want to be very clear that those are arguments about the kind of interplay of the statutes that were not raised until a mid-sentencing motion to dismiss the indictment, and so for this court to even consider them, I think you'd have to get over the district court's clear finding that that motion was untimely because it was brought into the fifth day of the sentencing hearing, and despite the argument being made this morning, I would just point out that the defendant was long on notice and in fact substantiated his notice of the government's theory that the underlying offenses, the criminal offenses here, were foreign drug crimes for which these were proceeds. I'll point you to his motion to dismiss that was actually brought pre-trial in docket 73, his motion to suppress where he said the government has no actual evidence that there were domestic crimes happening and therefore the representations in the warrant is false, his instructional conference discussion on docket 533, and his closing arguments docket 504. In each of those instances, Mr. Tardone's counsel makes clear that he understands the government is representing that these are proceeds of foreign crimes, not U.S. crimes, and so at any point prior to sentencing, he could have argued actually with respect to certain of the offenses, those proceeds can't qualify as the underlying specified unlawful activity, and so that was untimely, and I think for that reason alone, all these arguments about the statutory interplay aren't properly, were properly denied by the district court. Even if you thought you could reach them, with respect to section 1957, I took Mr. Tardone this morning to raise an argument he's raised for the first time in his reply brief that because the definition of criminally derived property in 1957 doesn't specifically reference foreign offenses, therefore it can't incorporate foreign offenses. That's expressly foreclosed by the Supreme Court's decision in RJR Nabisco. I'll point you to 579 U.S. 325 at 338, where Justice Alito said that RICO, RICO was the overlying statute there, but one of the predicates in that case was money laundering. It has predicates that plainly apply to at least some foreign conduct that includes the prohibition against engaging in monetary transaction in criminally derived property, which expressly applies when the defendant is a U.S. person to offenses that take place outside the United States. You just gave us the citation. Was that case in your briefing? No, because this was an argument made for the first time in reply. Oh, I see, yeah. So, but it's our, it's the Supreme Court's decision in RJR Nabisco, which expressly demonstrates and recognizes that section 1957 reaches foreign conduct because criminally derived property is defined as any foreign, any offense, any criminal offense. It certainly doesn't say foreign offense, but I think the general reference to any criminal offense encompasses it. And then that that statute otherwise can apply to a U.S. person outside of the United States, and so it would make no sense for it to not capture foreign offenses. And so I think that argument is squarely foreclosed by just the statute works and the Supreme Court's recognition. With respect to the other arguments he's making, again, which were all untimely, and I think you can resolve it there, our basic argument, as we lay forth in our brief, is that the term financial transaction, as it's defined broadly in the statute, encompasses, is a broad capacious term that encompasses many types of transactions, including a monetary transaction or monetary transfer. And you can see that from section 1957 itself, subsection F1, which defines monetary transaction for the purposes of that section, defines it as including, among other things, any transaction that would be a financial transaction under section 1956C4B. So it's expressly defining a monetary transaction as one form of a financial transaction. And so to the extent other provisions of the money laundering statutes refer more discreetly to not the broad term financial transaction, but they only cover, say, a monetary transfer into the United States or use of a monetary instrument, those are all species of financial transactions, and therefore there's no reason to think that they don't also qualify as offenses for which the specified unlawful proceeds, you know, the foreign offenses can serve as the predicate. I'm happy to address any other questions the court might have with respect to the suppression issues. Let me just say, again, we have clear factual findings by the district court about Cohen's consent and access to and dominion over this notebook, which there was clear evidence to her own testimony. He had given it to her once in 2006, and she had, you know, kept it in safekeeping for him while he was imprisoned in Spain, that she had full access to it while remaining in the home. But did she have access to it since there were divorce proceedings at that time? Yes. I would point you very specifically to docket entries 378-9, page 2, which is the short one-page order that the divorce court entered. All it says, and this is a factual finding the district court made that it didn't encompass this notebook, it says there's one paragraph, paragraph A, that says Tarden can come in and get his clothing, which are all in the second-floor bedroom closet. There's subsection B, which refers to specific religious items, and it lists them out, all of which should be in the garage closet. And then it says, otherwise, the court needs to hold a hearing to determine what papers Tarden is referencing here related to the divorce proceedings. The district court found both that that didn't, like, prevent Cohen from taking any action with respect to those papers, but regardless, nothing in the filings Tarden had made up to that point suggested in any way that this notebook would be relevant to the divorce proceedings. And so we have a specific factual finding. Also, I want to make sure that I get all of my diaries outlining my illegal conduct that I'm being prosecuted for, right? Can we really expect him to have claimed those items? No, but I guess what I would say is there's no plausible argument, at least the district court found he hadn't made one, that this notebook was relevant to the divorce proceedings. I mean, I think what's relevant is... Right, but I think the question is not, was it relevant to the divorce proceedings? I think the question is, did she have dominion and authority over it in that context? I mean, absent an order from the court that says she can't access something in the home she's living in, to which she's always had joint custody, I don't think anything about the divorce order suggested that became off limits to her. Again, there's no special rule for diaries. Like, if I have an apartment with a roommate, do you think I have... Can I consent to the police taking the diary of my roommate? I think honestly, Your Honor, you could. There may be unusual circumstances where it's maybe in a safe to which the person doesn't have the code, or there's some other specific protection the person took that would prevent the individual from accessing it. But as a general matter, if you're a roommate or a spouse and you enjoy full access to the property, you have the ability as a co-tenant or a co-resident to consent to give over to the government or anyone else, any of that property, at least for Fourth Amendment purposes. And that's what's important here. And can you address the fact that the government didn't let defense counsel know that they had the diary for two years? So, yes. I think, to be very clear, the diary is not relevant to the search warrants. The search warrants were for 11 properties, none of which was the villa. And the villa is where this diary was. So with respect to the arguments being made... The villa was the marital property, right? The marital property where Cohen was living. And the villa was where this property came from. So it's an entirely separate argument with respect to... It is a warrantless search. Well, not a search, but it's a warrantless obtaining of this property. And so the government, I think... It's been 16 years now, so I'm not quite sure of the chronology, but we became aware of this and that we intended to use it well before trial and turned it over. But I don't think you can say that anything about that we were obscuring anything with respect to the Franks hearing arguments as they had happened. And as soon as we turned it over, the defendant raised a new motion to suppress argument that was fully litigated. And again, that had nothing to do with the Franks arguments, because that affidavit was for 11 properties that did not include the villa, and therefore nothing about the obtaining of the Mickey Mouse notebook had anything to do with those arguments. I'm happy to address any of the questions. Just one thing on the sentencing. The defendant hasn't even addressed, much less distinguished, application of sentencing guidelines section 2K5.1, which as we point out, is what sentencing commission directs courts to do when there isn't a specifically outlined guideline for an offense in the guidelines manual. And we think that clearly applies here, where there's an underlying foreign offense for which the guidelines manual itself does not have a specific guideline. And that, plus this court's decision in Spence is enough to validate the base offense level here. Thank you. Thank you very much, Your Honor. Mr. Clue, you have saved four minutes for rebuttal. Thank you, Your Honor. Can you address, given that you spent a lot of your beginning time on the distinction between section 19, between 1956 and 1957, and then the government just identified some language that cross-references in terms of the definition. So can you explain again your position as to why the interplay should not apply in this way? Yes, and it may be because I spend so much time studying Spanish. It's very important to me when somebody's using the subjunctive tense. And he quotes the subjunctive use. You know, if in this circumstance, you know, even if a money, even if this element in 1957 would be something that matches something in the financial transaction section, what that tells you when you use the subjunctive, it means contrary to fact, it tells you that they're two different things. But it would be like that. It would be like that because I want you to know, when you're reading the statute, that just because it is also a financial transaction doesn't mean it can't be a monetary transaction. But that's contrary to the ordinary understanding of the words, which is when you use a subjunctive like that, you're talking about two different things. And of course, they are two different things. And they're defined differently. And they're not the same thing. And the rule of lenity always says, in that circumstance, it goes to the defendant. RJR Nabisco does not resolve this issue. RJR Nabisco is talking about RICO in a general way. This was not raised in that sense in RJR Nabisco. So that we've cited it. We were the first ones to cite RJR Nabisco. We cited it in the district court. The first major thing here is these avoidances. I call them affirmative defenses, the government raises, which are all bogus. Oh, motion to dismiss, motion to dismiss. I didn't even talk about the motion to dismiss in my argument. And yet they argued for five or six minutes about the motion to dismiss. The motion to dismiss is just another part of it. When you change the case after conviction and you say, even though we insisted that the jury resolve this case and that the jury has to find that it was punishable by the United States, even though after conviction, you say, no, we're effectively constructively amending the indictment to remove that allegation that we told you over Mr. Shrevenick's objection that has to come out because it can't work that way, then you have a right to make a motion to dismiss. But I don't even need to make that because it's the same argument either way. It cannot be domestic proceeds. And the constructive amendment argument applies the same way. Yates and Stromberg, as we've cited, you cannot let a jury go and reach a verdict on an illegal or invalid theory, which we know from this circuit's precedent, it was an illegal theory that there were domestic drug proceeds. It was an illegal, it doesn't, it's an invalid theory. And the government insisted and the district court, the government quotes page, docket 533 of the transcript. Please look at page 58 of that transcript. The court says, Mr. Shrevenick is begging the court saying there's no evidence of domestic drug proceeds. And what does the government say? The government says yes, well, we've got, we've got evidence there. I'm not saying I'm going to argue it, but we've got evidence there. And the district court says, don't you understand? You have to prove it. It has to stay in there. You have to let the jury convict on that basis. That is, the Supreme Court authority is very clear on that. You cannot let the jury even have the opportunity to convict on an invalid theory. And again, that's the only one they had felony proof on. And that's the only one they actually talked about a law at all. The other, the other things the government says, the government clearly raises it. And then we talk about RGR Nabisco. We talk about RGR Nabisco in our initial brief. I don't see how they can come in and say, oh, you don't have to consider it. He waived it. That's not right. That's not right. I'm sorry to be upset, but that's not right. That's not what these courts are for. And we got this through the whole case. Two years, we didn't know that three years, three years, we didn't know she was an undercover informant. Three years, she was wearing a wire. The week that she picks up that bag and puts it out on the porch for the FBI that closed bag because she thought that would protect her from the court order. If she's just leaving it there on the porch and the FBI is coming to get it, that doesn't put me in contempt of court. She does not have a right of access to that property. You can't ignore state courts. They're just as good as federal courts in this context. Are you saying that the underlying domestic order didn't speak anything to those kind of personal effects? It's, first of all, it did say religious items and the government's proof at trial was how these songs and other things in that notebook. The government's argument was they didn't even try to use it exclusively to try to connect. And again, the way they connect it is with confrontation clause violations based on Spanish conclusions about what these certain things that they think Spanish people thought that the Spanish police thought and made. But that was just one little entry in this thing. The rest of it was his songs, his poems, his religious thoughts. What was he doing every day? He spent every day studying to be a priest in that house. This is how he abandoned his rights there. And again, at trial, what happens? She says Cohen admits he was still living there until the moment he had the stay-away order. All of their arguments were false. They come out two years later, they come out three years later, and they come out in oral argument they're false. It's outrageous what happened in this case. The other issue is the government has never discussed the property interest. It's fine. The reasonable expectation of privacy is bogus. It doesn't add up into this court's case law. But there's still a property interest. Because once you bag it, whoever bags it, the police bag it, she bags it, once it's bagged up in a Louis Vuitton bag or a garbage bag, it's sealed up, it's his property, they know it's his property, it's in a closed container, and the only thing they've ever argued against that closed container requiring a warrant was that she had a right of access. And that's the one thing she didn't have. Because that court order, whether you say that the songs and other things in that book are religious or not is one thing. But whether they were or not, the court said, we're going to have a hearing to determine whose paperwork is what. And every bit of that paperwork was Alvaro's. She had no right to throw it away. She had no right to dispose of it. Mr. Clu, you're over the time. If you'd like to briefly wrap up, I'll allow it. Let's see. Let's see here. Let's see, wrap up. There is, again, all of these are first impression arguments that the government's making. Whether for the warrantless search, whether for the claim that a search warrant that bogusly claims that it's authorized as a search for federal drug crimes. All of the other, their claim that we didn't set forth the false statements in it. First of all, the magistrate judge and the district court found them for us and they're in the record. But we did find them pages 33 to 36 of our initial brief. 30, 36 to 39 of our reply brief. Every claim of waiver is bogus in this case. They lied to us. They cheated us on the instructions. They cheated us on the elements that they went for the jury. When they didn't get the testimony they wanted from Sharon Cohen, they called her a prostitute. This is absolutely desperate hours prosecution. Thank you. Ms. Wilson, you've got a minute if you would like it. Thank you, your honor. Yes, as to the watches, we don't have to prove up ownership at the pleading stage. This is not, while 12b6 informs the inquiry, this is not a typical civil dispute between two private parties. This is the government seizing property from somebody. So 853n makes clear you state the time and circumstances. All of this evidence as to which watches they were were in the record. Their own agent testified that he matches, matched the watches in the safe owned by the collection to the ones that were seized by the government on the invoices, that he matched the invoices and the watches. That evidence was in the record. We referenced it in our petition for it to be dismissed without prejudice. It was sufficiently pleaded, but even if this court disagrees, it's a time and circumstances issue that's plainly curable. When the government is taking property that is owned by third parties who are not part of the criminal case, a hearing is essential. And it was sufficient, our right to discovery and right to a pleading was sufficiently pleaded here as to the watches. Injury in fact, as to the standing on the other two was clearly established. The Jabbat case makes that clear. They have ownership. That's the one thing that you need under Jabbat. They also have skin in the game. They, Artemio and the partner members of these LLCs expended time, expended money. They suffered an injury in fact when the government took this property. That is the standing inquiry. This was dismissed on standing. They overwhelmingly had standing. They owned these properties. Same as to the cars. Kite School always was on the title. Kite School paid completely for the car when it was seized. It was headed to Kite School where Artemio was running that company. It was a car company based in Spain that Artemio was running and of which he was co-owner. That is more than enough to establish injury in fact for standing. It also establishes ownership both formally and functionally. Thank you. Thank you. Thank you.